IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHELIOUS FORAKER, JESSIE PASSFUMA, LINDA WIGGINS, and MICHAEL GRIBLIN, on behalf of themselves and all others similarly situated, | § § § § § | |
| Plaintiffs, | § § | |
| vs. | § § | CIVIL ACTION NO. 4:06-cv-01856 |
| HIGHPOINT SOUTHWEST SERVICES, L.P. | § § § | |
| Defendant. | § § § | |

### DEFENDANT HIGHPOINT SOUTHWEST SERVICES, L.P.'S MOTION FOR SUMMARY JUDGMENT WITH REGARD TO PLAINTIFF SCOTT LIGON

*TO THE HONORABLE U.S. DISTRICT JUDGE ATLAS:*

NOW COMES Defendant Highpoint Southwest Services, L.P. ("Highpoint") files this Motion for Summary Judgment as to the individual claims of Plaintiff Scott Ligon ("Ligon"), pursuant to Federal Rule of Civil Procedure 56, and would show as follows:

**I.**

**INTRODUCTION**

Ligon is one of approximately 146 Plaintiffs conditionally certified as "class members" in this case. Ligon is exempt from receiving overtime wages under the Fair Labor Standards Act ("FLSA") because he falls under the Outside Sales and Motor Carrier exemptions. Specifically, while employed for Highpoint, Ligon regularly performed sales-related tasks outside the premises of Highpoint's office. In addition, Ligon traveled to states outside of Texas, where he lived and worked, in furtherance of Highpoint's commercial purposes, and he would carry tools, supplies, and signs across

state lines. Based on this information there are no genuine issues of material fact, and as a matter of law, Ligon is clearly exempt from receiving overtime wages. Thus, summary judgment must be granted.

## II.

## FACTUAL BACKGROUND

On March 14, 2007, Ligon was deposed in Dallas, Texas as part of a representative discovery in this conditionally certified class action for overtime wages allegedly due field service representatives or merchandisers for HPSW.[1] Ligon held the position of service representative ("rep"), for Highpoint starting in March of 2005 and was still in that position on the date his deposition was taken, March 14, 2007.[2]

Prior to working at Highpoint, Ligon accumulated over 20 years experience in sales.[3] Ligon stated that his prior sales experience was directly related to his position at Highpoint.[4] The extensive sales experience Ligon brought to Highpoint included ten years of auto sales and ten to fifteen years in retail sales.[5]

Ligon's focus was selling. According to him, the purpose of merchandising was to make things look attractive to stimulate sales, stating, "dead plants just don't sell and tend to create negative sales."[6] His goal, as an outside sales rep for Highpoint was to make customers "stop and look" at the plants because if they stopped and looked, they

---

[1] Deposition Scott Ligon, page 1, attached hereto as Exhibit A.

[2] *Id*. at page 9:4-5, page 12:7-8.

[3] *Id*. at page 66:23-25, page 67:1-16.

[4] *Id*.

[5] *Id*.

[6] *Id*. at page 35:6-8.

would most likely buy them.[7] As Ligon stated in his deposition, "what I do is selling," and "if it looks good, [customers] are going to buy it."[8]

In effort to constantly increase and stimulate sales, Ligon went to great lengths to create a visually appealing environment in all of his Home Depot stores. For example, Ligon took the initiative to "face" every sign and label in the Garden Center in his Home Depot stores.[9] Ligon explained in his deposition that appearance sells.[10] His goal, as an outside sales rep for Highpoint was to make customers "stop and look" at the plants because if they stopped and looked, they would most likely buy them.[11] As Ligon stated in his deposition, "what I do is selling," and "if it looks good, [customers] are going to buy it."[12] On several occasions during his deposition, Ligon stated that he did "whatever it takes" to increase sales.[13] Ligon took notice of the plants that were selling well, and he pushed to capitalize on that type of customer-driven demand.[14]

Additionally, Ligon traveled to New Orleans in furtherance of Highpoint's business operations, placing him in the purview of the Motor Carrier exemption of the FLSA.[15]

---

[7] *Id.*

[8] *Id.* at page 67:20-25.

[9] *Id.* at page 40:5-16, 24-25, page 41:1-25.

[10] *Id.* at page 42:1-9.

[11] *Id.*

[12] *Id.* at page 67:20-25.

[13] *Id.* at page 45:5-7.

[14] *Id.* at page 39:1-13.

[15] *Id.* at page 11:1-9.

# III.

# ARGUMENTS & AUTHORITIES

A. **LIGON IS EXEMPT FROM RECEIVING OVERTIME WAGES BECAUSE THE OUTSIDE SALES EXEMPTION APPLIES TO HIM.**

The regulations define an outside salesperson as any employee:

(a) Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in:

    (1) Making sales within the meaning of section 3(k) of the Act, or

    (2) Obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(b) Whose hours of work of a nature other than that described in paragraph (a)(1) or (2) of this section do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer: *Provided*, that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.[16]

The factors indicative of whether an employee is "engaged in sales," thereby meeting the criteria for the outside sales exemption include:

(1) "if the job was advertised as a sales position and the employee was recruited based on sales experience and abilities;"

(2) if the employer provided the plaintiff-employee with "specialized sales training;"

(3) the "employee's compensation structure . . . Compensation based wholly or in significant part on commissions correlates with a finding that the employee does sales work;"

(4) "Independently soliciting new business;" and

---

[16] 29 C.F.R. § 541.5; *Edwards v. Alta Colleges, Inc.*, 2005 U.S. Dist. LEXIS 3753, *25 (W.D. Tex. Feb. 28, 2005).

(5) "The nature and scope of an employee's supervision . . . An employee who receives little or no direct or constant supervision in carrying out daily work tasks is more likely to be considered engaged in sales."[17]

After reviewing these factors, the court concluded in *Nielsen v. Devry, Inc.* that the Nielsen plaintiffs -- field representatives who sold defendant Devry's educational programs -- were engaged in sales.[18] The *Nielsen* court further concluded that said plaintiffs met the statutory and regulatory definition of outside salespeople, and thus were exempt employees and were not entitled to the overtime protections afforded by the FLSA.[19]

Courts have articulated various factors probative of an employee's status as an outside salesperson, including whether the employee (1) must solicit new business; (2) receives specialized sales training; (3) was hired and denominated as a salesperson; and (4) whether the position was advertised as a sales position.[20] Other indicia of sales-related activities include sales training and lack of direct or constant supervision.[21] In deciding whether an employee is an outside salesperson, the Court must look beyond labels and descriptions and also inquire into the particular facts of the actual work performed.[22] None of the indicia of sales-relatedness can be considered in isolation. Instead, the Court must consider the totality of the circumstances in a task-related

---

[17] *Nielsen v. Devry Inc.*, 302 F. Supp. 2d 747, 753-54 (W.D. Mich. 2003).

[18] *Id.* at 760-61.

[19] *Id.* at 761.

[20] *See Fields v. AOL Time Warner, Inc.*, 261 F. Supp.2d 971, 974 (W.D. Tenn. 2003).

[21] *Id.* at 975; *Nielsen*, 302 F. Supp. 2d at 758; *Krispy Kreme*, 346 F. Supp. At 1106.

[22] *See, e.g., Ale v. TVA*, 269 F.3d 680, 688-89 (6th Cir. 2001).

context.[23] An employee is more likely to be considered engaged in sales if the job was advertised as a sales position and the employee was recruited based on sales experience and abilities.[24]

Ligon is engaged in an outside sales position, making him exempt from receiving overtime wages. The position Ligon held was advertised by Highpoint as a sales job, making the strong presumption that Ligon was in fact engaged in sales.[25] Furthermore, Ligon wrote orders for Delray, constituting sales.[26] In fact, Ligon stated he and other reps were "hammered" weekly about making sure Delray orders were placed.[27] Ligon had a strong understanding of sales and merchandising, and had a long history of sales experience.[28] Importantly, Ligon made his own schedule, traveling to different Home Depot stores in the Dallas area, and he was not closely supervised or managed.[29]

**1. Ligon's primary duty was to sell plants by placing orders.**

The term "primary duty" means the principal, main, major or most important duty that the employee performs.[30] Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the

---

[23] *See Hodgson v. Krispy Kreme Doughnut Co.*, 346 F. Supp. 1102, 1103 (M.D.N.C. 1972).

[24] *See Krispy Kreme*, 346 F. Supp. at 1106; *Jewel Tea*, 118 F.2d at 208.

[25] Deposition of Scott Ligon, page 7:14-25, page 8:1-3, at Exhibit A; *Krispy Kreme*, 346 F. Supp. at 1106.

[26] *Id*. at page 23:2-5, page 44:11-12, 17-19.

[27] *Id*.

[28] *Id*. at page 6:23-25, page 7:1-13, page 35:6-10.

[29] *Id*. at page 16:1-19, patge 21:12-25, page 22:1-21.

[30] 29 C.F.R. § 541.700(a).

employee's job as a whole.[31] Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.[32]

In deciding whether an employee is an outside salesperson, the Court must look beyond labels and descriptions and also inquire into the particular facts of the actual work performed.[33] The Court must consider the totality of the circumstances in a task-related context.[34] Indicia of sales-related activities include sales training and lack of direct or constant supervision.[35]

The regulations explain that "the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee."[36] However, time alone, "is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work."[37]

---

[31] *Id.*

[32] *Id.*

[33] *See, e.g., Ale v. TVA*, 269 F.3d 680, 688-89 (6th Cir. 2001).

[34] *See Hodgson v. Krispy Kreme Doughnut Co.*, 346 F. Supp. 1102, 1103 (M.D.N.C. 1972).

[35] *Fields v. AOL Time Warner, Inc.*, 261 F. Supp.2d 971, 975 (W.D. Tenn. 2003).*Id*. at 975; *Nielsen v. Devry Inc.*, 302 F. Supp. 2d 747, 758 (W.D. Mich. 2003); *Krispy Kreme*, 346 F. Supp. at 1106.

[36] 29 C.F.R. § 541.700(b).

[37] *Id.*

Additionally, other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.[38] In *Ackerman, et. al. v. Coca-Cola Enterprises, Inc.*, the Tenth Circuit held that merchandisers who performed tasks such as distribution and promotion of Coke products, restocking shelves, replacing product, and cleaning display shelves fell under the outside sales exemption.[39] The *Ackerman* Court held that the merchandisers resembled driver-salesmen who make sales of their product at the locations they visit because orders were actually placed.[40] The "merchandising work" only promoted the sales that the *Ackerman* plaintiffs were making.[41]

Ligons's most important job duty was placing orders for plants and trying to increase Home Depot's plant sales.[42] Every week Ligon made an order for Home Depot to purchase plants from Delray.[43] All other work duties of Ligon were incidental to the sale of plants for RPS's vendors.

Everything Ligon did in his position with RPS revolved around the primary duty of selling plants. In his own words, "what I do is selling."[44] The focus was the ordering,

---

[38] 29 C.F.R. § 541.500; *Edwards v. Alta Colleges, Inc*., 2005 U.S. Dist. LEXIS 3753, *25 (W.D. Tex. Feb. 28, 2005).

[39] 179 F.3d 1260, 1261 (10th Cir. 1999).

[40] *Id*. at 1266.

[41] *Id*. at 1267; 29 C.F.R. § 541.505(a).

[42] Deposition of Scott Ligon, page 35:6-8, page 39:1-13, page 42:1-9, page 45:5-7, page 67:20-25, at Exhibit A.

[43] *Id*. at page23:2-5, page 44:11-12, 17-19.

[44] Id. at page 67:20-25.

but everything Ligon did was in effort to boost sales of plants, including culling the bad plants and setting out new plants for display. Furthermore, Ligon was not heavily supervised.[45] As a matter of law, Ligon's primary duty was placing orders and making sales

### 2. Ligon was customarily and regularly engaged away from RPS's place of business placing orders and driving sales of plants.

The phrase "customarily and regularly" means a frequency that must be greater than occasional but which, of course, may be less than constant.[46] Tasks or work performed "customarily and regularly" includes work "normally and recurrently performed every workweek; it does not include isolated or one-time tasks."

Ligon customarily and regularly placed orders for Delray plants within as many as ten different Home Depot stores.[47] Ligon made Delray orders every Monday of every week that he worked for RPS.[48] The culmination of Ligon's work throughout the week- making the displays looking nice, furthered the goal of selling plants occured each Monday, when he would actually generate purchase orders for more plants.[49]

Ligon was always away from RPS's place of business. RPS's business headquarters are located in Dallas, Texas.[50] Ligon worked at several Home Depot

---

[45] *Id*. at page 22:12-24.

[46] 29 C.F.R. § 541.701.

[47] Deposition of Scott Ligon, page 12:11-13, at Exhibit A.

[48] *Id*. at page23:2-3, page 44:11-12, 17-19.

[49] *Id*. at page 35:6-8, page 67:20-25.

[50] Defendant Highpoint Southwest Services, L.P.'s Original Answer to Plaintiff's Original Complaint at paragraph 6.

locations in the Dallas, Texas area, but he was never at the RPS offices.[51] Additionally, Ligon had a home office, where he completed much of his work for Highpoint.[52] In fact, Ligon testified that his job entailed "a lot of work at home on the computer." On certain day, Ligon would spend several hours working from his home office.[53] There is no evidence that Ligon <u>ever</u> worked at RPS's place of business.

Ligon's ordering of plants was customary and regular because he did it every week, which is precisely how "customarily and regularly" is defined by the regulations.[54] "Merchandising" activities were actually promotional work that was in furtherance of his sales efforts, making all of Ligon's work for RPS exempt.[55] Like the plaintiffs in *Ackerman*, Ligon was an exempt person because he placed orders as his primary duty, and he also engaged in other sales-related merchandising duties.[56] According to *Ackerman*, "what matters is . . . [whether Ligon sold] products at the locations where [he] performed merchandising activities" and whether "at those locations, the merchandising work promoted those sales."[57] The answer in this case is yes. Ligon made sales in the form of orders while at different Home Depot locations, and all the merchandising work he did related to and promoted those sales. As such, Ligon falls squarely within the

---

[51] Deposition of Scott Ligon, page 10:1-3, 11:5-9, page 12:9-19, at Exhibit A.

[52] *Id*. at page 19:20-25.

[53] *Id*. at page 20:4-7.

[54] 29 C.F.R. § 541.701.

[55] *See Ackerman*, 179 F.3d at 1665-66; 29 C.F.R. § 541.503; 29 C.F.R. § 541.505.

[56] *See id*. at 1266.

[57] *Id*. at 1267.

outside salesperson exemption because there are no material issues of fact, and as a matter of law, he is exempt.

**B.    LIGON IS EXEMPT FROM RECEIVING OVERTIME WAGES BECAUSE HE FALLS UNDER THE MOTOR CARRIER EXEMPTION.**

The Motor Carrier Act exemption covers "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions [of the Motor Carrier Act, 49 U.S.C. § 31502]."[58] Pursuant to 49 U.S.C. §§ 1301, 13502 the Secretary of Transportation may prescribe requirements for qualifications and maximum hours of service for "motor carriers" and "private motor carriers," when needed to promote the safety of operations."[59]  "Motor carriers" is defined as a person providing commercial motor vehicle transportation for compensation.[60]  Highpoint is not asserting that Ligon utilized commercial motor vehicles to perform his job duties at Highpoint.  Rather, Highpoint asserts that Ligon falls under the Motor Carrier Act exemption to the FLSA as a "motor private carrier."

"Motor private carrier" was defined as a person transporting property by motor vehicle when:

(A)   The transportation is provided in section 13501;

(B)   The person is the owner lessee or bailee of the property being transported; and

---

[58] *See* U.S.C. § 213 (b)(1); *King v. Asset Appraisal Services, Inc.*, 470 F. Supp. 2d 1025, 1029(D. Neb. 2006).

[59] *See* 49 U.S.C. § 31502(b); *Morgan v. Francois*; 170 Fed. Appx. 978, 980, 2006 WL 488439 (8th Cir. 2006).

[60] *See* 49 U.S.C. § 13102(14).

(C) The property is being transported . . . to further a commercial enterprise.[61]

Motor Carrier Act exemption has traditionally "applied to most employees who drove any type and size of motor vehicle in interstate commerce."[62]

On August 10, 2005 the Safe, Accountable, Flexible, and Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") was enacted which amended the definition of "motor private carrier." Pursuant to SAFETEA-LU, the definition of "motor private carrier" is now:

A person other than a motor carrier transporting property by commercial motor carrier when:

(A) The transportation is as provided in Section 13501 of this title;

(B) The person is the owner, lessee or bailee of the property being transported; and

(C) The property is being transported sale, lease, rent or bailment or to further a commercial enterprise.[63]

There is no binding authority interpreting the SAFETEA-LU amendments and their impact upon the FLSA. Rather, there are only two decisions from district courts outside of the Fifth Circuit.[64] This Court is not required to follow the decisions or the analysis in *Musarra* or *King*. In fact, this Court should look to the Department of Labor and its response, or lack thereof to the SAFETEA-LU amendments. There has been no action or change taken by the Department of Labor relating to the SAFETEA-LU

---

[61] *Spears v. Preston Refrigeration Co., Inc.*, 205 F. Supp. 2d 1104, 1106 (D. Minn. 2002)(quoting 49 U.S.C. §13102(13)(2004).

[62] *See Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692, 2006 WL 2779856 at n. 19 (S.D. Ohio 2006).

[63] 49 U.S.C. § 13102(15).

[64] *See Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692; *King v. Asset Appraisal Servs.*, 470 F. Supp. 2d 1025 (D. Neb. 2006).

amendments, and there has been no definitive statement made by Congress that contemplates the over-arching change that the SAFETEA-LU amendments would have upon inclusion or exemption from the FLSA.

Ligon was a "motor private carrier" under the previous definition. Ligon traveled across state lines;[65] he carried equipment and materials he needed to perform his duties, including tools and signs with him;[66] and Ligon transported those items to further the commercial enterprise of Highpoint.[67] Ligon could not have properly carried out his job duties without the tools he carried across state lines, and therefore, the tools and signs Ligon carried constituted "property" within the meeting of the Motor Carrier Act.[68] Thus, Ligon fits under the guise of the Motor Carrier exemption to the overtime provisions of the FLSA.[69]

More importantly, even if the Court does find that SAFETEA-LU amendments limit the Motor Carrier Exemption relating "motor private carriers" to including only persons using a commercial motor vehicle, this only applies after August 10, 2005. There is absolutely no basis, whatsoever, to apply the SAFETEA-LU amendments

---

[65] Deposition of Scott Ligon, page 11:1-9, at Exhibit A.

[66] *Id.* at page 45:8-21.

[67] *O'Neal v. Kilbourne Med. Labs., Inc.*, No. 05-50, 2007 U.S. Dist. LEXIS 22620, *28-*29 (E.D. Ken. Mar. 28, 2007).

[68] *Friedrich v. U.S. Comp. Servs.,* 974 F.2d 409, 417 (3d Cir. 1992).

[69] *See Id.,* 974 F.2d at 410, 413 (field engineers who regularly traveled interstate to perform installation, maintenance, and repair on customers' computer hardware, carrying tools, component parts, and equipment fell under the Motor Carrier exemption to the FLSA).

retroactively.[70] So, even under the worst case scenario, Ligon would be exempt from overtime wages from March 1, 2005 to August 10, 2005.[71]

## IV.

## CONCLUSION

In conclusion, Ligon is not entitled to receive any overtime wages. Ligon was a an outside sales person, as defined by the FLSA. Additionally, Ligon is exempt from receiving overtime under the Motor Carrier exemption because he traveled across state lines, carrying tools and signs that he used in his position as an employee for Highpoint. Either one of these exemptions, standing alone, are sufficient to prohibit Ligon from receiving any overtime wages. But, without a doubt, both the outside sales and the Motor Carrier exemptions, taken together, absolutely require that summary judgment be granted against Plaintiff Scott Ligon because he is exempt from the overtime provisions of the FLSA.

**WHEREFORE, PREMISES CONSIDERED**, Defendant respectfully requests that the Court grant this Motion for Summary Judgment with Regard to Plaintiff Scott Ligon and such other and further relief, either at law or equity, to which Defendant may be justly entitled.

---

[70] *Musarra*, 454 F. Supp. 2d at 703; ("SAFETEA-LU does not include any language evidencing Congressional intent to apply the amendment retroactively, and such a finding would result in confusion and unfairness [to] various individuals who until August 10, 2005 were exempt."); *O'Neal*, 2007 U.S. Dist. LEXIS 22620 at *36-*37 (retroactive application of a statute is improper if such application "would impair rights a party possessed when the party acted, increased a party's liability for past conduct, or impose new duties with respect to transactions already completed.").

[71] Deposition of Scott Ligon, page 9:1-4, page 8:21-25, at Exhibit A.

Respectfully submitted,

    /s/ Harold Jones
Harold D. Jones
ATTORNEY-IN-CHARGE
SD Bar No. 585536
Texas Bar No. 10894020
R. Scott Anderson
SD Bar No. 39108
Texas Bar No. 01210045
Jessica R. Brown
SD Bar No. 587176
Texas Bar No. 24048975
ANDERSON & JONES, PLLC
One Galleria Tower
13355 Noel Road, Suite 1645
Dallas, Texas 75240
Telephone: (972) 789-1160
Facsimile: (972) 789-1606

**ATTORNEYS FOR DEFENDANT HIGHPOINT SOUTHWEST SERVICES, L.P.**

## CERTIFICATE OF SERVICE

I certify that on May 29, 2007, a copy of forgoing instrument was forwarded to the following parties pursuant to the FEDERAL RULES OF CIVIL PROCEDURE via e-filing:

    Richard J. Burch
    Michael K. Burke
    Bruckner Burch PLLC
    1000 Louisiana, Suite 1300
    Houston, Texas 77002

    /s/ Harold Jones
Harold D. Jones